## THE JARED INGERSOLL.

### THE BAM.

### THE JOHN MURRAY.

### THE ARTHUR McCABE.

**F. E. GRAUWILLER TRANSP. CO., Inc., et al. v. UNITED STATES et al. and three other cases.**

Nos. A–16790–16792, A–16815.

District Court, E. D. New York.

Dec. 23, 1943.

Harold M. Kennedy, U. S. Atty., of Brooklyn (Vincent A. Catoggio, Jr., and Gilbert Fleisher, both of New York City, of counsel), for United States.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for libelants and respondents-impleaded.

BYERS, District Judge.

These causes present the question of liability for a collision between the government-owned and operated northbound, laden steamship Jared Ingersoll and a tow

which was off Governor's Island, headed toward the Statue of Liberty upper bay, on September 21, 1942, at about 2:56 a. m. war time.

The tow consisted of the tug John Murray, having the loaded wooden sand scows Arthur McCabe, to port, and Bam to starboard, alongside. The McCabe was cut in two by the Ingersoll; the Bam was caused to capsize, and the tug was damaged on her starboard side from contact with the Bam.

The John Murray is an 800 h. p. diesel tug, 90.40 feet long and 20.2 feet in beam, and drew about 9 feet.

The scows were about 114 feet by 34 feet, with an inside depth of about 9 feet. As fully loaded, the cargoes were about 9 feet in depth, leaving the scows with little freeboard midships. The tow had come out of the East River and was bound for Port Richmond, Staten Island.

The night was clear, i. e., visibility was good, light clouds veiling the moon at times. The tide was at last of the ebb in the North River, estimated at about one mile; the wind was out of the north, with hourly average velocity of 24 miles between 2 and 3 a. m.

The tow and the steamship both displayed regulation lights which were bright and showing. The make-up of the tow was conventional; that is, the scows toed in ahead of the bow of the tug, and the stern of the latter was about 30 feet aft of the stern-ends of the scows. Since the latter were laden, the pilot-house of the tug was high enough, above the top of the cargoes laden on the scows, to enable the navigator of the tug to have ample and unobstructed view in all quarters.

The Ingersoll was one member of a convoy and was following a similar vessel ahead, the Pickering, at about 1800 feet, and the latter was some 300 feet westerly or about 3 points on the port bow of the Ingersoll, as they moved northerly to an uptown anchorage in the North River.

The Ingersoll is a Liberty vessel, i. e., a single-screw steamship, 441 feet in length by 54 feet in beam, and as laden drew 28 feet.

The facts are not in substantial dispute: It is common ground that the Murray blew a 2-whistle signal to the Pickering as the tow was less than half a mile off the Pickering's starboard bow, when the latter was about abreast of the north light

on Governor's Island, which signal was answered, since the heading of the tow was such that obviously she would pass under the Pickering's stern.

For some reason, the Ingersoll then blew two blasts, to assert that she interpreted the tug's two blasts as indicating a starboard passing with the Ingersoll. That was not heard by the Murray and so was unanswered, and the tow held her course and speed as the privileged unit in a crossing situation, blowing two successive one-blast signals to the Ingersoll after a short interval so to indicate. These were not answered, but shortly after the second the Ingersoll blew three blasts, the backing signal, when danger of collision was evident, and her engines were put into reverse. The tug at once did likewise, and then cast her stern lines to the scows, so as to avoid being squeezed when the then inevitable contact should take place. In other words, neither vessel at any time blew an alarm.

These several causes ensued.

In the first, the owner of the Bam and her captain sue the United States as owner of the Jared Ingersoll, under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq.; answer was filed, which alleged fault of the diesel tug John Murray in failing to adhere to her own 2-blast signal, and impleading the tug and her owner. The latter filed claim to the tug and answered, alleging the Ingersoll's failure to navigate properly as the burdened vessel in a crossing situation.

The second cause is the same in all respects, save that it was brought by the owner and the captain of the scow Arthur McCabe.

The third cause is that of the owner of the cargoes of sand and gravel laden on the scows, and also the tug John Murray, against the United States as owner of the Jared Ingersoll, under the Suits in Admiralty Act; it seeks recovery for loss of cargo and damage to the Murray, alleging the same fault on the part of the Ingersoll as in the first cause; the answer asserts the same faults of the Murray as are alleged in the impleading petitions in the first and second causes.

In the fourth cause, the United States, as owner of the Jared Ingersoll, sues the owner of the Murray and libeled the latter, to recover for damage to the Ingersoll. The tug was claimed, and the answer sets up, as a defense, the same mat-

ters as constitute the cause pleaded in the first three suits by the respective libelants.

Thus these several cases were tried together, and will be disposed of in one decision, with separate decrees.

### Findings.

1. Ownership of all vessels and cargo is found as alleged in the respective pleadings, in accordance with the stipulation of proctors at the trial.

2. At about 2:42 a. m. on September 21, 1942, the steamship Jared Ingersoll was proceeding northerly in the upper bay about 900 feet westerly of, and slightly below, Governor's Island, under full engine speed; at 2:51 a. m. she proceeded at slow speed; at 2:53 the engines were stopped, and at 2:54 they were put into full astern.

3. At about 2:56 a. m. the Ingersoll struck the port side of the loaded sand scow McCabe, in tow alongside to port of the diesel tug Murray, with such force as to cut that scow in half, and to cause the tug to strike the sand scow Bam, in tow alongside to starboard of the said tug, so strongly as to cause the Bam to capsize and cast her cargo, and to cause damage to the said tug.

4. The tug and her tow were headed on a course to cross ahead of the Ingersoll, and the tug was the privileged vessel in a crossing situation, and the Ingersoll was the burdened vessel, whose duty it was to give way, which she unreasonably and without justification failed to do.

### Conclusions.

1. The respective owners of the scows McCabe and Bam, and the cargoes laden on them, and of the tug Murray are entitled to recover the damages suffered by them, from the United States of America.

2. The impleading petitions filed in the first three causes, and the libel in the fourth cause, should be dismissed with one bill of costs as to the first three causes, and a separate bill of costs in the fourth cause.

■ The reasons which lead to the foregoing seem to require a brief discussion:

When the Ingersoll was about abeam of the southerly light on Governor's Island, in the position in the Channel which has been stated, the tow was observed about 3 to 4 points on the starboard bow; the speed of the Ingersoll was about 7 knots and that of the tow was about 2½ knots.

Only the port light of the tow was ever observed by the Ingersoll at any time, although it is testified for her by the Sandy Hook pilot and her master, who were both on the bridge, that they observed a slight change in the position of her staff lights (although they do not agree as to that apparent change with reference to the whistle signals), and they interpreted this as indicating that she was turning to her own port sufficiently to effect a starboard passing with the steamer. Acting upon that assumption, which was not based upon any exchange of whistle signals, the steamer continued at full speed until 2:51 a. m. when the engines were reduced to half-speed and so continued for two minutes.

The north and south lights of Governor's Island are about 3150 feet apart, and the collision occurred about half-way between, though a little nearer the north than the south light. This means that the Ingersoll covered about 1800 feet, or about 4 ship-lengths, after observing the tow, which would require about 3 minutes, at full speed of 7 knots, and as I estimate, about 4 minutes at half engine speed.

As has been stated, the ship moved under half engine speed from 2:51 to 2:53, but of course her full speed was not arrested until some time after 2:53, when the engines were stopped; she had not lost her weigh at 2:56, although the engines were reversed at 2:54, or the McCabe would not have been cut in two. Her master says that at impact she was making not over 2 or 3 knots, enough to justify the right rudder that was then ordered for the first time; when the full astern engine room signal was given, the master estimated the Ingersoll's speed at from 5 to 8 miles.

She had sighted the tow when the latter was a little more than a half a mile away, coming out of the East River, showing her red light only. She was the length of Governor's Island ahead, and at that time the tow was under no duty to blow any signal to the Ingersoll.

The pilot of the Pickering, the vessel ahead of the Ingersoll, is clear to the effect that, when his ship was nearly abreast of the northern light on Governor's Island, he observed the Murray, saw her green or starboard light, and that she was headed for the stern of the Pickering and was

about 900 feet away and 3 or 4 points on his starboard bow, and at the Pickering's speed of 5 knots, he knew she would pass under his stern.

He had blown one blast to a tow to his port, and then heard two blasts from the tug, and answered with two, because, as he said, the Murray may not have understood that the one blast from the ship was blown to another tow.

This exchange of 2-blast signals between the Murray and the Pickering is so clearly established as to leave no ground for surmise or inference on the part of the Ingersoll that she herself was included in or affected by the interchange.

Indeed her pilot says the Pickering sounded a 2-blast signal after a similar one from the Murray. Kerr, the master of the Ingersoll, seems not to have been asked if he observed any such signal from the Pickering, but that is unimportant since the pilot was navigating the steamer.

No reason appears to justify any signal from the Ingersoll to the Murray at that time, save a desire to impose upon the latter a starboard passing, i. e., a surrender of her privilege which, under the circumstances as they then existed, she was under no duty to accept, on the theory that holding her course and speed—as she did—was taking her into a position of peril.

It should be observed that the Ingersoll did not reduce to half engine speed for any reason inspired by the presence or navigation of the Murray, but because she found herself overhauling the Pickering whose speed had been reduced from 8 to 5 knots as she was about to enter the North River.

Kerr fixes the interval between his first observation of the Murray and the collision as 6 or 7 minutes, which, if correct, afforded ample time to the Ingersoll to so order her progress as to avoid the contact altogether.

Kerr seeks to justify the navigation of his vessel on the theory that the Murray started to swing to her own left or port as she blew two whistles (to the Pickering), and thereby altered her heading by 2 points or so, thus inducing the belief that she would continue the swing sufficiently for a starboard passing with the Ingersoll, although a swing of as much as 5 points would be necessary for that purpose, according to her original heading; that after she started that initial swing, she blew one blast, and changed her heading back to her own starboard, and thus in effect lured the Ingersoll into a course which ended in disaster. Not only this, but she later blew three whistles and reversed, following the Ingersoll's example in that respect, and, but for so doing, probably would have passed safely ahead of the Ingersoll.

This in spite of the pilot's testimony that the Murray was 1000 feet ahead when she blew a one-blast signal, and never showed anything but her port light to the steamer. About the only fault not charged to the tug seems to have been that of coming to anchor under the stem of the Ingersoll.

The entire explanation is based upon the unjustified attempt of the Ingersoll to absorb, and convert to her own uses, the exchange of signals between the Murray and the Pickering, and the generally superior attitude of a deep sea navigator toward harbor traffic. The following is quoted from Kerr's deposition:

"Q. Did your lookout report a change of the light? (On the Murray) A. No.

"Q. Is the lookout expected to report that? A. No, sir.

"Q. Did the lookout report the Murray's light at all? A. No, sir.

"Q. Never? A. No, sir. The lookouts on the ships never report ordinary traffic in the harbors in inland waters."

Both Kerr, the master, and Sullivan, the Sandy Hook pilot, stated that, when the Murray was first observed about half a mile ahead and 3 points or so on the Ingersoll's starboard bow, the vessels were in a crossing situation; the evidence does not disclose that it ever became anything else. It has been assumed that the Ingersoll did blow a 2-blast signal, but it was not heard by the Murray, as is shown by her maintaining her course and speed. If the Ingersoll was serious in her assertion that there was an agreement to change a crossing situation into a starboard passing, she has been conspicuously deficient in so establishing by any fair margin of proof. I regard the testimony of her master and pilot as destructive of any such assertion. Among other things, she failed to disclose any change of her own course to port, in order to assure a starboard passing by a safe margin.

■ That the burden of proof rested with the Ingersoll was decided, for in-

stance, in The Scranton, 2 Cir., 221 F. 609.

The testimony of the Murray's captain has not been discredited in any respect. While the heading of the tug was not at right angles to the Ingersoll's course at any time, it was such as to enable her to cross ahead at her course and speed which she maintained. She did not change her heading at any time, and the attempted explanation that her staff light changed was entirely tenuous; as the Ingersoll moved up the Channel, she saw the tug's staff lights from a moving platform, that is all.

Settle separate decree in each case as stated above.